ORDERED.

**Dated:  July 26, 2022**

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                               Case No. 8:21-bk-00647-MGW
                                                     Chapter 7
AGV Partners, Inc.,

    Debtor.
_____/

## MEMORANDUM OPINION REGARDING
## PRIORITY OF STATUTORY LANDLORD'S LIEN

To secure an Economic Injury Disaster Loan from the U.S. Small Business Administration, the Debtor gave the SBA a security interest in all its property—as well as the proceeds from that property—and agreed to insure the SBA's collateral. Six months after the Debtor filed for bankruptcy, the premises it was leasing burned down, destroying the SBA's collateral. The Debtor received $110,000 in insurance proceeds, which is the only meaningful asset left in the estate. The Debtor's landlord, which holds a $25,000 administrative expense claim for unpaid rent, claims it has a landlord's lien on the insurance proceeds that primes the SBA's lien.

It is true that, under section 83.08(2), Florida Statutes, the Debtor's landlord has a lien on all the Debtor's property that is found (or usually kept) on the leased premises, which would have included the SBA's collateral.[1] And that lien is superior to any lien acquired after the Debtor brought the property on the premises.[2] But, under the plain language of section 83.08, Florida Statutes, that lien extends only to the Debtor's property—not the proceeds of the property.[3] Because the statutory landlord's lien does not extend to proceeds of the Debtor's property, the SBA is entitled to the $110,000 in insurance proceeds.

## I.    Factual Background

The Debtor operated an indoor inflatable playground under the trade name "Pump It Up."[4] On February 20, 2022, the Debtor leased commercial space from Lynmar Properties, Inc. to operate its indoor playground.[5] Weeks later, the COVID-19 pandemic struck.[6] Because of the COVID-19 pandemic, the Debtor, which specialized in children's birthday parties, was required to temporarily shut down its facility.[7]

---

[1] § 83.08(2), Fla. Stat.

[2] *Id.*

[3] *Id.*

[4] Doc. No. 8, ¶ 3; Doc. No. 133, ¶ 4.

[5] Doc. No. 133, ¶ 5; Doc. No. 134-1.

[6] Doc. No. 8, ¶ 3; Doc. No. 50-1; Doc. No. 133, ¶ 5; Doc. No. 134-1.

[7] Doc. No. 8, ¶ 5; Doc. No. 133, ¶ 7; Doc. No. 134-1.

**A.    To secure an Economic Injury Disaster Loan, the Debtor gives the SBA a lien on all its personal property.**

To mitigate the economic effect of COVID-19, the Debtor applied for an Economic Injury Disaster Loan (EIDL) from the U.S. Small Business Administration.[8] The SBA approved the Debtor for a $150,000 loan.[9] On June 7, 2020, the Debtor executed a $150,000 promissory note in favor of the SBA.[10]

To secure payment of the note, the Debtor gave the SBA a blanket lien on all its (tangible and intangible) personal property, as well as any proceeds of the property:

> The Collateral in which this security interest is granted includes the following property that [the Debtor] now owns or shall acquire or create immediately upon the acquisition or creation thereof: all tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes, (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letters of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. *The security interest [Debtor] grants including all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.*[11]

---

[8] Doc. No. 138, ¶ 6; Doc. No. 154, ¶ 4.

[9] Doc. No. 138, ¶ 6.

[10] Doc. No. 131-2; Doc. No. 138, ¶ 6; Doc. No. 154, ¶ 5.

[11] Doc. No. 131-2.

The SBA properly perfected its blanket lien by recording a UCC-1 financing statement.[12]

### B.    The Debtor obtains insurance for the SBA's collateral.

Under the terms of the security agreement, the Debtor was required to insure the SBA's collateral up to 80% of its insurable value.[13] In September 2020, the Debtor obtained $110,000 of "Business Personal Property" insurance coverage from Cincinnati Insurance Companies to insure the SBA's collateral.[14] For reasons that are unclear, however, the policy listed "Paola Galliani, DBA: Pump It Up – Westchase"—rather than the Debtor (AGV Partners, Inc.)—as the named insured.[15]

### C.    The Debtor files for bankruptcy.

According to the Debtor, by time February 2021 rolled around, it needed a breathing spell from its rent obligations under the lease.[16] And, perhaps more important, it wanted to propose a payment plan to deal with the financial impact of COVID-19.[17] So, on February 11, 2021, the Debtor filed for chapter 11 bankruptcy.[18]

---

[12] Doc. No. 138, ¶ 7; Doc. No. 154, ¶ 9.

[13] Doc. No. 131-2.

[14] Doc. No. 154-5.

[15] *Id.*

[16] Doc. No. 133, ¶ 10.

[17] *Id.*

[18] Doc. No. 1.

### D.    The Debtor failed to pay nearly $40,000 in prepetition and postpetition rent.

At the time the Debtor filed for bankruptcy, it was only $1,084.29 behind on its rent. That was the prorated prepetition rent for the first ten days of February 2021. At the end of February, Lynmar (the Debtor's landlord) moved to compel the Debtor to pay the remainder of the rent for February, as well as the rest of its postpetition rent going forward.[19] The Court granted Lynmar's request (at least in part) and ordered the Debtor to begin paying its rent under the lease on April 11, 2021, with the rent due from the petition date through April 10, 2021, to be paid through the plan.[20]

Later, the Debtor moved to assume its lease with Lynmar as part of proposing a plan of reorganization.[21] To assume the lease, the Debtor had to pay its past-due prepetition and postpetition rent. The Debtor and Lynmar agreed that the Debtor owed $37,096.26 in past due rent ($1,084.29 for prepetition rent and $36,011.97 for postpetition rent).[22] On August 4, 2021, the Court entered an order authorizing the Debtor to assume its lease with Lynmar so long as the Debtor paid the $37,096.26 in past-due rent.[23]

---

[19] Doc. No. 17.

[20] Doc. No. 34.

[21] Doc. No. 50.

[22] Doc. No. 68, ¶ 4; Doc. No. 103, ¶¶ 6 & 7.

[23] Doc. No. 68, ¶¶ 4 & 5; Doc. No. 53 at 4.

### E.    The Debtor's equipment was destroyed in a fire.

The day after the Court entered its order authorizing the Debtor to assume its lease with Lynmar, a lightning strike caused a fire at the leased premises.[24] The fire caused extensive damages to the premises and its contents.[25] The equipment that was damaged included the SBA's collateral.[26]

### F.    The Debtor received $110,000 in insurance proceeds from the fire.

After the Debtor's equipment was damaged in the fire, the Debtor filed a statement of claim with Cincinnati Insurance.[27] Cincinnati Insurance investigated the fire and decided to pay the $110,000 policy limits for the Business Personal Property coverage.[28] The $110,000 check was made payable to "Paola Galliani DBA Pump It Up – Westchase."[29] Realizing that the insurance proceeds were made payable to the Debtor's principal—not the Debtor—the Debtor asked Debtor' counsel what it should do with the insurance proceeds.[30] Debtor's counsel advised the Debtor to deposit the insurance proceeds into the Debtor's debtor-in-possession account, which

---

[24] Doc. No. 133, ¶ 14; Doc. No. 134-1; Doc. No. 154, ¶ 13; Doc. No. 158, p. 5, ll. 9 – 23.

[25] Doc. No. 154, ¶ 13.

[26] Doc. No. 154, ¶ 13; Doc. No. 163-2.

[27] Doc. No. 163-2.

[28] Doc. No. 163-2; Doc. 133-6.

[29] Doc. No. 133-6.

[30] Doc. No. 159, p. 37, ll. 1 – 21.

the Debtor did.[31] The $110,000 in insurance proceeds remain in the Debtor's debtor-in-possession account.[32]

### G.    The Debtor, Lynmar, and SBA fight over the $110,000 in insurance proceeds from the fire.

Two weeks after Cincinnati Insurance paid out the insurance proceeds, Debtor's counsel filed a fee application seeking $30,267.50 in fees and $2,870.34 in costs.[33] The following month, Lynmar filed an application for payment of administrative expenses seeking $48,399.60 in unpaid rent.[34] The SBA did not object to the fee application or Lynmar's administrative expense application so long as neither was paid from the insurance proceeds.[35]

The Court approved both applications—the fee application in the amount of $20,000 and Lynmar's administrative expense application in the amount of $25,096.26.[36] As it turns out, the insurance proceeds are the only source of funds to pay the Debtor's attorney's fees or Lynmar's administrative expense claim.[37] So this

---

[31] *Id.*

[32] *Id.*

[33] Doc. No. 79.

[34] Doc. No. 103.

[35] Doc. 94; Doc. No. 159, p. 6, l. 10 – p. 7, l. 9.

[36] Doc. No. 114; Doc. No. 150.

[37] Doc. No. 159, p. 5, l. 10 – p. 9, l. 6.

Court must now determine whether either application may be paid from the $110,000 in insurance proceeds the Debtor received.

## II.    Conclusions of Law

The SBA argues it has a first priority security interest in the insurance proceeds by virtue of its written security agreement and properly recorded UCC-1 financing statement.[38] The argument is straightforward: under the security agreement, the Debtor granted the SBA a lien on all its tangible and intangible personal property *and any proceeds* of that personal property.[39] Florida's Uniform Commercial Code likewise provides that a "security interest attaches to any identifiable proceeds of collateral."[40] And Florida's UCC defines "proceeds" to include "insurance payable by reason of the loss . . . or damage to[] the collateral."[41] Thus, the SBA reasons it has a first priority lien on the $110,000 in insurance proceeds.

Lynmar, however, claims it holds a landlord's lien under section 83.08(2), Florida Statutes, that primes the SBA's lien. To secure the payment of rent under a lease, section 83.02, Florida Statutes, grants landlords a lien "upon the property

---

[38] Doc. No. 131.

[39] Doc. No. 131-2.

[40] § 679.3151(1)(b), Fla. Stat.

[41] § 679.1021(lll)(5), Fla. Stat. (defining "proceeds" to mean "[t]o the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral").

found upon or off the premises leased or rented," as well as "[u]pon all other property of the lessee or his or her sublessee or assigns, usually kept on the premises."[42] Florida's landlord's lien statute is clear about the priority of the landlord's lien: "This lien shall be superior to any lien acquired subsequent to the bringing of the property on the premises leased."[43]

According to Lynmar, it is undisputed that the Debtor's personal property was in the premises "long before" the SBA acquired (or perfected) its security interest in the Debtor's property.[44] The SBA is unwilling to concede that fact. When the Debtor brought its personal property on the premises is irrelevant, however, because, for the reasons discussed below, a landlord's lien only attaches to property "usually kept on the premises"—not the proceeds of that property.

**A.    The SBA has a lien on the insurance proceeds.**

Before explaining why Lynmar's landlord's lien does not extend to the insurance proceeds, the Court must first address the Debtor's claim that the SBA does not have a lien on the insurance proceeds.[45] In support of that claim, the Debtor advances two arguments.

---

[42] § 83.08(2), Fla. Stat.

[43] § 83.08(3), Fla. Stat.

[44] Doc. No. 138, ¶ 14.

[45] In its briefing, Lynmar does not dispute that the SBA has a lien on the insurance proceeds. Rather, Lynmar claims that its landlord's lien primes the SBA's lien or, in the alternative, that the SBA's lien on the insurance proceeds is no longer perfected because the proceeds were deposited into the Debtor's debtor-in-possession bank account, and the SBA does not have any control over that account. Doc. No. 138, ¶ 20; § 679.3121(2)(a), Fla. Stat. ("A security interest in a deposit account may be perfected only by control under § 679.3141."). Lynmar's first argument (i.e., its lien primes

First, the Debtor implicitly concedes that the SBA's security interest in its collateral attaches to any identifiable "proceeds" of the collateral and that, generally speaking, "proceeds" is defined to include insurance proceeds. But the Debtor contends that insurance proceeds constitute "proceeds" under the UCC only "to the extent [the proceeds are] payable to the debtor or the secured party."[46] Because the insurance proceeds here were made payable to the Debtor's principal, not the Debtor, the Debtor says they do not constitute "proceeds" under Florida's UCC.[47]

Second, the Debtor argues that the insurance policy was owned by the Debtor's principal—not the Debtor.[48] If, in fact, the Debtor's principal owned the insurance policy, then the Debtor could not have granted the SBA a security interest in the insurance proceeds.[49] The Debtor also points out that the SBA never amended or supplemented its UCC-1 Financing Statement to include the Debtor's principal (Paola Galliani) or the trade name "Pump It Up" as an "Additional Debtor."[50]

Neither argument has merit.

---

the SBA's lien) is the subject of this opinion. The second argument (i.e., the SBA's lien is no longer perfected now that the insurance proceeds have been deposited into the Debtor's debtor-in-possession account) doesn't require much discussion. Under § 679.3151(3), Florida Statutes, a "security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected," which was the case here.

[46] Doc. No. 154 at 4 (citing § 679.1021(lll)(5), Fla. Stat.).

[47] *Id.* at 4 – 5.

[48] *Id.* at 5.

[49] *Id.*

[50] *Id.* at 6.

The Debtor is estopped from arguing that it did not own the insurance policy or that the insurance proceeds were not "payable to the debtor." The Debtor concedes that its principal obtained Business Personal Property coverage to comply with the *Debtor's* obligations under the security agreement.[51] The Debtor sought (and was granted) permission to use *the Debtor's* cash (which was the SBA's collateral) to pay for the insurance policy.[52] In a sworn statement filed with the Court, the Debtor's principal attested to the fact that "*AGV [the Debtor]* held an insurance policy with Cincinnati Insurance Companies."[53]

What's more, the $110,000 check was made payable to "Paola Galliani DBA Pump It Up – Westchase,"[54] which was the trade name listed on the EIDL Loan Intake Application Summary.[55] In his sworn statement, the Debtor's principal attested to the fact that "*AGV [the Debtor]* received a check from Cincinnati Insurance Companies in the amount of $110,000."[56] The Debtor, upon advice of its counsel, deposited the insurance proceeds into its debtor-in-possession account.[57]

---

[51] *Id.* at 5 ("In an effort to comply with the terms of the Security Agreement, the Debtor's principal, Paola Galliani, obtained the Insurance Policy covering business personal property.")

[52] Doc. No. 9, Ex. A; Doc. No. 30, Ex. A.

[53] Doc. No. 133, ¶ 8 (emphasis added).

[54] Doc. No. 133-6.

[55] Doc. No. 154-5. Technically, the Intake Application Summary listed the trade name as "Pump It Up," while the check listed the trade name as "Pump It Up – Westchase." Doc. No. 133-6; Doc. No. 154-5. For purposes of this case, that is a distinction without a difference.

[56] Doc. No. 133, ¶ 22 (emphasis added).

[57] Doc. No. 159, p. 37, ll. 1 – 21.

If all that weren't enough, Debtor's counsel represented in open court that *the Debtor* received the insurance proceeds and that they constituted the SBA's collateral:

> We have – the Debtor received an insurance check for the equipment that was damaged. The equipment was subject to a lien of the SBA and, accordingly, the insurance proceeds constitute[] the collateral of the SBA.[58]

On these facts, the Debtor cannot now claim that it did not own the insurance policy or that the insurance proceeds were not "payable to the Debtor," particularly considering the Debtor's trade name ("Pump It Up") was listed on the insurance policy and as part of the name of the payee on the check from Cincinnati Insurance.

**B.    Lynmar's landlord's lien does not extend to the insurance proceeds.**

To determine whether Lynmar's landlord's lien extends to the insurance proceeds, this Court must first look to the plain language of section 83.08, Florida Statutes.[59] When a statute is clear and unambiguous, this Court must eschew the rules of statutory construction in favor of the statute's plain language.[60] Here, section 83.08's plain language limits landlord's lien to the tenant's property—it does not extend the lien to "proceeds" of that property:

> **Landlord's lien for rent**.—Every person to whom rent may be due, the person's heirs, executors, administrators or assigns, shall have a lien for such rent *upon the property*

---

[58] Doc. No. 158, p. 5, l. 9 – p. 6, l. 6.

[59] *Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294, 301 (Fla. 2017).

[60] *Id.* ("'When the statute is clear and unambiguous,' we use the plain language of the statute and avoid rules of statutory construction to determine the Legislature's intent.").

found upon or off the premises leased or rented, and in the
possession of any person, as follows . . .

*** ***

(2)    Upon *all other property* of the lessee or his or her
sublessee or assigns, usually kept on the premises. . . .[61]

Even if section 83.08 was ambiguous, and this Court could resort to canons of
statutory construction, the Court's conclusion would be the same. Here, two canons
come to mind.

The first cannon is *expressio unius est exclusio alterius*. "Under *expressio unius est
exclusio alterius* cannon, the mention of one thing implies the exclusion of another."[62]
The second cannon is the "omitted-case" cannon, which holds that nothing is to be
added to what a statute states or reasonably implies:

We can also look to the omitted case canon of
construction. Under this canon, "[n]othing is to be added
to what the text states or reasonably implies (*casus omissus
pro omisso habendus est*). That is, a matter not covered is to
be treated as not covered."[63]

Because section 83.08 grants landlords a lien on certain property of the tenant, but
not the proceeds of that property, the Court concludes, applying traditional canons of
statutory construction, the Florida Legislature intended to exclude a lien on the
proceeds of a tenant's property.

---

[61] § 83.08(2), Fla. Stat.

[62] *State v. Hearns*, 961 So. 2d 211, 219 (Fla. 2007).

[63] *Nunes v. Herschman*, 310 So. 3d 79, 84 (Fla. 4th DCA 2021) (quoting Antonin Scalia & Bryan A.
Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012)).

This conclusion is bolstered by the fact that, in the UCC, the Florida Legislature expressly provided that a security interest in collateral attaches to proceeds of the collateral.[64] Thus, the Florida Legislature knew how to grant a security interest in proceeds if it wants to. Yet, when enacting section 83.08, Florida Statutes, the Florida Legislature chose not to grant landlords a lien on the proceeds of a tenant's property.[65]

In its briefing, Lynmar cites a number of cases for the proposition that a landlord's lien, under section 83.08, Florida Statute, is superior to an Article 9 security interest when the property encumbered by the lien was on the leased premises before the other creditor perfected its Article 9 security interest.[66] That may be true so far as it goes. But none of those cases involve insurance proceeds—much less hold that a landlord's lien attaches to insurance proceeds.

This Court is aware of only one case that considered whether a landlord's lien attaches to insurance proceeds. That case—*Old Colony Insurance Company v.*

---

[64] § 679.3151(1)(b), Fla. Stat.

[65] In its briefing, Lynmar questions why section 679.3151(1)(b), which provides that a security interest attaches to proceeds of collateral, doesn't ally to its landlord lien. The answer is because the UCC expressly says it does not apply to landlords' liens (other than agricultural liens). § 679.1091(4)(a), Fla. Stat. ("This chapter does not apply to . . . [a] landlord's lien, other than an agricultural lien.").

[66] Doc. No. 138, ¶¶ 15 & 16 (citing *Walling Enters., Inc. v. Mathias*, 636 So. 2d 1294, 1297 (Fla. 1994); *United States v. S.K.A. Associates, Inc.*, 600 F.2d 513, 515 (5th Cir. 1979)).

14

*Goldberg*—is a district court decision out of the Southern District of Florida from more than 60 years ago.[67]

In that case, Alfred Goldberg leased property from Annie Peek.[68] Under the lease, Goldberg was required to fully insure the premises against fire.[69] Goldberg obtained the required insurance from Old Colony. Three days before the policy expired, a fire destroyed the building and its contents.[70] Because several parties claimed an interest in the insurance proceeds, Old Colony interpleaded the proceeds into the court registry.[71] Relying on *American Jurisprudence (Second)*, the district court determined that, while Peek had a statutory landlord's lien for unpaid rent, the landlord's lien did not attach to the insurance proceeds:

> [Peek] had a statutory lien for any unpaid rent, under *Florida Statutes 83.08(2)*, against personal property, *but this lien does not extend to insurance proceeds from injury to or destruction of the chattels.*[72]

Although *Old Colony*'s reasoning was sparse, the outcome in that case is consistent with this Court's plain reading of section 83.08(2), Florida Statutes. And

---

[67] 1959 U.S. Dist. LEXIS 4359 (S.D. Fla. May 14, 1959).

[68] *Id.* at *2.

[69] *Id.* at * 2 – 3.

[70] *Id.* at *4.

[71] *Id.*

[72] *Id.* at *8 (citing 32 Am. Jur. 2d § 604 ).

this Court is unaware of any other basis to extend Lynmar's landlord's lien to the

insurance proceeds when section 83.08(2) does not do so.

## III.    Conclusion

In their book *Reading Law: The Interpretation of Legal Texts*, the late Justice

Antonin Scalia and Bryan Garner explain why this Court is powerless to add to a

statute what is not there:

> The principle that a matter not covered is not covered is so
> obvious that it seems absurd to recite it. The judge should
> not presume that every statute answers every question, the
> answers to be discovered through interpretation. As the
> noted lawyer and statesman Elihu Root said of the judge:
> "It is not his function or within his power to enlarge or
> improve or change the law."[73]

Because section 83.08, Florida Statutes, does not grant to Lynmar a lien on the

insurance proceeds in this case, this Court is powerless to "improve" the statute for

Lynmar's benefit. The SBA therefore has a first-priority security interest in the

insurance proceeds.

---

Attorney Christopher Emden is directed to serve a copy of this Memorandum
Opinion on all interested parties who do not receive service by CM/ECF and to file
a proof of service within three days of its entry.

---

[73] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012)
(citations omitted).

**Christopher J. Emden, Esq.**
**United States Department of Justice**
   *Counsel for U.S. Small Business Administration*

**Liben M. Amedie, Esq.**
**The Liben Law Firm**
   *Counsel for Lynmar Properties, Inc.*

**Buddy D. Ford, Esq.**
**Jonathan A. Semach, Esq.**
**Heather Reel, Esq.**
**Buddy D. Ford, P.A.**
   *Counsel for Debtor*